# UNITED STATES DISTRICT COURT

## FILED

for the

Eastern District of California

DEC 0 9 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

In the Matter of the Search of )
)
INFORMATION ASSOCIATED WITH )
abdulbasierhashimi@yahoo.com THAT IS STORED )
AT PREMISES CONTROLLED BY Yahoo Inc. )
)
)

Case No. **2: 1 6 - SW - 0 7 7 1   KJN**

## SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1591(a) | Sex trafficking of children or by force, fraud, or coercion |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's Signature*

Derek Stigers, Special Deputy
United States Marshal FBI Child Exploitation Task Force
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **Dec 9, 2016**

*Judge's signature*

City and state: Sacramento, California

Kendall J. Newman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF TASK FORCE OFFICER DEREK STIGERTS

I, Derek Stigerts, being first duly sworn, hereby depose and state as follows:

### I.   INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Yahoo Inc., an email provider headquartered at 701 First Avenue, Sunnyvale, California 94089. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Yahoo Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      On November 23, 2016, I signed an affidavit in support of an application for a search warrant for information associated with the Yahoo Inc. account abdulbashierhashimi@yahoo.com. After reviewing that affidavit, the Honorable Kendall J. Newman signed a warrant authorizing the search of that account (case number 2:16-SW-0741 KJN). Following issuance of that search warrant, I determined that the account to be searched and the subject of the investigation's name as identified in the affidavit, application and warrant contain a typographical error. The account to be searched should have been abdulbasierhashimi@yahoo.com, and the subject's name is ABDUL BASIER HASHIMI. This affidavit is identical to the affidavit I signed on November 23, 2016, except for the corrections to the account and subject names, and the correction of a typographical error in the name "Hashimi," which appears in paragraph 33(b).

3.      I have been a sworn police officer with the Sacramento Police Department since January 1991. I am currently assigned to the FBI's Child Exploitation Task Force, where I primarily investigate the commercial sexual exploitation of children (child prostitution). I have served as a Special Deputy United States Marshal since January 2007. I have attended and

1

provided many hours of instruction on child prostitution and the victims of such crimes.   During my tenure on the task force, I have conducted and participated in numerous investigations of criminal activity, including cases involving juvenile prostitution and the commercial sex trafficking of children.

4.      As a Special Deputy United States Marshal, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

5.      I am currently conducting a criminal investigation regarding the sex trafficking of minors in violation of Title 18, United States Code, Section 1591.

6.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1591(a) – sex trafficking a minor, have been committed by ABDUL BASIER HASHIMI. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities and fruits of this crime further described in Attachment B.

## II.      JURISDICTION

8.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## III.      BACKGROUND CONCERNING PROSTITUTION

9.      Through my training and experience, I am aware of the following traits of prostitution and how the internet is used to further the activities of illegal prostitution:

      a.   Individuals who, through enticement, intimidation, or force, enlist individuals to become prostitutes, and who profit from the prostitution of others are called "pimps." Pimps are sometimes euphemistically referred to as "management." When prostitutes are under pimp control, pimps are

2

called traffickers.

b.  Pimps often times enlist other prostitutes that work for them to recruit, transport, and supervise new prostitutes.  Many times this is done to insulate the pimps from law enforcement regarding their illegal activity.

c.  Pimps and their prostitutes sometimes use social networking sites such as Facebook.com, Instagram, Kik, and other sites to recruit females into prostitution.  These sites are accessible through computers as well as smart phones and tablets.

d.  Pimps, as well as prostitutes who are not "managed," have embraced the internet as a means of advertising services and communicating with customers.

e.  Certain websites have been created to facilitate communications between prostitutes and their clients.  The more notable website relevant to prostitution in the Eastern District of California is the "Adult Services, Escort" section of "Backpage.com."  These websites allow pictures to be posted as part of advertisements.  I have viewed prostitution advertisements on many of these websites.

f.  Subjects who use the internet to post prostitution-related advertisements on websites such as Backpage.com often use photographs in the advertisements.  These photographs often show a nude or semi-nude female.  These females are sometimes under the age of 18 years old.

g.  Advertisements for prostitutes often contain codes for the services provided.  For example, the term "w4m" means women for men.  The term "in-calls only" means that the prostitute will be providing the location for the sexual transaction.  The term "donation" is often used to refer to the cost for the sexual transaction.

h.  Pimps attempt to avoid the attention of law enforcement through the high anonymity provided by the internet.

i. Most juvenile prostitutes have pimps. Prostitutes will often refuse to divulge the identity of their pimps to law enforcement. Many pimps often instruct their prostitutes on what to say and what not to say to law enforcement.

j. Prostitutes are often instructed by the pimp on how to detect undercover officers. When arranging "dates" with clients over the phone, prostitutes rarely discuss the details of the sexual acts that are to occur until they meet in person.

k. Pimps at times use physical force and/or fear to control the prostitutes. They control the prostitutes' actions, and collect money earned through acts of prostitution. The pimps facilitate the prostitution by transporting the prostitutes to locations where the prostitution occurs. The pimps, at times, transport prostitutes across state lines for the purpose of prostitution.

l. Prostitutes and/or pimps often stay in motels and hotels while traveling. The prostitutes and pimps travel via rental vehicles, vehicles, airplane, or bus during their travels. The pimps use the monies earned during acts of prostitution to purchase food, lodging, clothing and other items.

m. Pimps often possess firearms to assist in protecting and intimidating their prostitutes.

n. Pimps sometimes sell drugs as another means to make money. The pimps often provide drugs to the prostitutes to suppress their appetites and to assist with the demands of prostituting for long periods of time.

o. Pimps can be either male or female.

p. The term "daddy" is commonly used by prostitutes when referring to their pimps. The pimp's phone number is often programmed as "daddy" in the prostitute's cell phone.

q. Pimps often request or force their prostitutes to obtain tattoos of names

4

and/or symbols that are related to the pimp's name or nickname.

r.   Prostitutes use cellular telephones as a way to communicate with clients. These phone numbers are included in the advertisements that are posted on the various prostitution assisting websites.  Contact is made through phone calls as well as text messages.

s.   Pimps and their prostitutes communicate with each other regarding prostitution activity using cellular phones.  Communication is conducted through phone calls as well as text messages and sometimes through social networking websites.

t.   Pimps and prostitutes communicate with others involved in the prostitution/pimp sub-culture either by voice calls or text messages regarding prostitution/pimp activities.  In addition, many cellular phones now have web-browsing capabilities that allow them to access the internet. Such phones can be used to post and update online prostitution-related advertisements.

u.   Pimps and their prostitutes use cellular telephone cameras to take photographs of the prostitutes used in the prostitution advertisements.

v.   Pimps and their prostitutes use cellular telephones to transmit photographs to email accounts and/or prostitution assisted internet sites.

w.   Pimps and prostitutes use personal e-mail accounts to post their advertisements on prostitution assisting web sites.

x.   Pimps sometimes video record sexual encounters with their prostitutes with cellular telephones.

y.   Pimps and prostitutes often travel together; however, this is not always the case.  When a pimp's control over a prostitute is sufficient, he may allow her to work without his direct supervision, or under the supervision of another trusted prostitute.  This type of independent activity may occur in the same city as the pimp, or may be in another city or state.  In these

5

instances, control by the pimp is maintained through frequent communications with the prostitute, as well as his trusted relationship with the female, the female's fear of what might happen to her or others still under the pimp's direct control if she refuses to comply with the pimp's demands, the female's fear of associates of the pimp in the location in which she is working, and her inability to live independently. When prostitutes are working for a pimp located in a different city or state, money is often sent back to the pimp electronically, either through electronic fund transfers or wire transfers. In some cases, money is carried by the prostitute back to the pimp.

## IV.    PROBABLE CAUSE

10.    On November 11, 2014, at approximately 9:25 a.m., Sacramento Police Department (SPD) Officer Lamar was working routine patrol in the vicinity of Mack Road and Stockton Boulevard in Sacramento, California. This area is known to law enforcement as a place with prostitution activity.

11.    Officer Lamar observed two females, who were later identified as a 14-year-old (the "Victim") and the Victim's older sister ("Individual A"). Officer Lamar observed the Victim and Individual A engaged in a physical altercation. There was an older male also present; this male was later identified as the Victim's foster brother ("Individual B").

12.    After identifying the Victim, Officer Lamar found several unopened condoms in her possession. Officer Lamar learned through a search of the SPD computer database that the Victim was reported missing on October 1, 2014. Officer Lamar contacted the Victim's adoptive mother ("P.W."). P.W. told Officer Lamar that she believed that the Victim was working as a prostitute.

### The Victim's First Interview

13.    Officer Lamar interviewed the Victim. A summary of the Victim's statements during the interview is set forth below:

a. The Victim began working as a prostitute approximately one month before

6

her contact with Officer Lamar. She did not work as a prostitute often, only when she needed money. The Victim estimated that she had worked as a prostitute five times.

b.  A woman using the name "Star" introduced the Victim to prostitution. The Victim did not know Star's real name. The Victim described Star as a black female who was approximately 18 to 21 years old. Star taught the Victim how to prostitute and told the Victim to ask her (Star) if she (the Victim) ever needed money.

c.  The Victim used the name "Paris" when she was working as a prostitute. She worked outside of Sacramento because people knew her in Sacramento. Star drove the Victim and other girls to Reno, Los Angeles, Hollywood, and other places. The Victim told Star and the other girls that she was 18.

d.  The Victim did not post any prostitution advertisements on prostitution-related websites. She only worked on the streets. Star often drove past the Victim to keep an eye on her. Star would pick up the Victim when she was done working as a prostitute. The Victim and Star often slept in Star's car. Sometimes, the Victim and Star would sleep in a hotel room.

e.  The Victim gave Star half of the money the Victim made working as a prostitute. The Victim stated that she gave Star money in exchange for Star providing transportation.

f.  Star gave an unidentified man money as compensation for taking care of her (Star). Star and the Victim would meet the man to give him money that was made from prostitution. The Victim was never allowed to meet him or get close to him. She described him as a black male with short hair.

g.  Earlier on the morning of November 11, 2014, Star dropped off the Victim on Mack Road near Highway 99 in Sacramento, California, so the Victim

could work as a prostitute. The Victim had condoms in case she needed to use them with prostitution clients. The Victim was working as a prostitute when her brother and sister found her.

h.  The Victim stated that no one forced her to be a prostitute and no one hit her. She indicated that she was not supposed to talk to the police because Star and the unidentified man to whom Star gave money told her (the Victim) not to. She was not told what would happen if she talked to the police, but they said "karma" would get her back.

i.  The Victim said her cell phone number was 519-8061 or a similar number.

14.   Officer Lamar asked the Victim for her cellular phone. The Victim provided her phone, which was missing the battery. The Victim retrieved the battery from her bra and handed it to Officer Lamar.

15.   P.W. arrived at the scene and spoke to SPD Officer Rinehart. P.W. told Officer Rinehart that the Victim's cell phone number was (916) 519-8063.

16.   SPD officers contacted me and I asked the officers to transport the Victim to the SPD Hall of Justice along with any evidence so that I could continue the investigation.

17.   When I arrived at the Hall of Justice, I received the evidence seized from the Victim. Officers also provide the Victim's cell phone number. I entered the cell phone number, (916) 519-8063, into the Google.com search engine and located at Backpage.com escort advertisement. The Backpage.com advertisement was linked to the Sacramento region and contained the phone number (916) 519-8063. The advertisement was dated October 3, 2014. As stated above in paragraph 8(e), Backpage.com advertisements, which are purportedly for escort services, are often prostitution advertisements. The photographs in the advertisement were not of the Victim. The post ID was "7670931 Sacramento."

### The Victim's Second Interview

18.   Next, I interviewed the Victim. Her statement was consistent with what she told Officer Lamar. Set forth below is a summary of the additional details that the Victim provided during the interview:

8

    a.  The Victim stated she did not use internet advertisements for her prostitution services, although the Victim also indicated that Star made internet posts for her. She stated that Star also worked as a prostitute.

    b.  The Victim stated that Star was not her pimp and that Star gave the money earned through prostitution to Star's boyfriend. The Victim had seen Star's boyfriend beat Star. Star's boyfriend's phone number was 230-4048. The Victim indicated that this phone number would be in her cell phone.

    c.  The Victim stated that she was hit by a car and had to go to the hospital for the injuries.

    d.  The Victim stated that Star and the Victim had sexual relations.

    a.  The Victim did not consent to a search of her cell phone nor would she provide the pass code to access her phone.

19.     Following the interview, I was not able to identify Star or Star's boyfriend. All evidence was booked into SPD property. The case was classified as inactive.

### The Victim's Third Interview

20.     On July 8, 2015, SPD Detective Morse and I contacted the Victim at her home. After explaining to the Victim that we were there for a follow-up interview, the Victim agreed to be interviewed. Below is a summary of the Victim's statements:

    a.  The Victim stated that everything she said during her first interview was a lie. There was no one named Star. She was scared during the first interview, but she was not scared anymore.

    b.  The Victim identified ABDUL BASIER HASHIMI. She indicated that she no longer talks to HASHIMI, but that he had previously threatened her using the social media application Kik.com.

    c.  The Victim stated that she lied about getting hit by a car. She indicated that she was injured when she was in Oakland, California. She was in a

9

car with other girls who wanted her to work as prostitutes, so she jumped
out of the car. The Victim indicated that HASHIMI took her to and from
Oakland.

d.   The Victim stated that the Backpage.com advertisement, which contained
the telephone number (916) 519-8063, was a prostitution advertisement
for her. The Victim denied engaging in prostitution. She stated that other
girls engaged in prostitution.

e.   The Victim stated that HASHIMI's telephone number was 670-9792.
The Victim stated that she initially told HASHIMI that she was 17 years
old. Later, she told him that she was 16 years old. The Victim stated that
she never told HASHIMI that she was actually 14 years old.

f.   The Victim stated that she met HASHIMI on Tagged, which is a social
media application. She indicated that she thought she still had their
messages saved on her account.

g.   The Victim stated that she ran away from home several times to meet with
HASHIMI. The Victim indicated that she and HASHIMI were dating and
that they had sex. The Victim stated that she was with HASHIMI the
entire time she was on the run, from October 2014 until police found her
in November 2014.

h.   The Victim first met HASHIMI in person in Natomas, California.
HASHIMI drove a small 4-door Honda. HASHIMI told the Victim that
he wanted her to work as a prostitute. The Victim told HASHIMI that she
did not want to do it, but she would be willing to help him. HASHIMI
asked the Victim for permission to use her photo in advertisements for
other girls who worked as prostitutes for him.

i.   After being contacted by the police, the Victim did not talk to HASHIMI
often. However, he asked her for money at one point and also threatened
her.

j. Between October 2014 and November 2014, the Victim traveled to Reno, Nevada with a transgender female whose real name was Vincent. This person also used the name Vanessa Jackson. Both went to Reno to work as prostitutes. However, during the trip, the Victim did not work as a prostitute.

k. Between October 2014 and November 2014, the Victim worked as a prostitute. She did not have sexual intercourse with clients, but would instead perform oral sex or engage in sexual fetishes. The Victim gave all of the money she earned from prostitution to HASHIMI, which she estimated to be "thousands of dollars."

l. There were other girls who worked for HASHIMI. There were times when the Victim would watch other girls work for HASHIMI as prostitutes on the streets. There were instances when these other girls would give the money they earned from prostitution to the Victim, who would then give the money to HASHIMI.

m. HASHIMI hit the Victim on two occasions. During one incident, HASHIMI slapped the Victim across the face because she refused to have sex with a client. She could not remember the circumstances of the second incident.

n. The Victim believed HASHIMI would come after her if he found out that she gave information to law enforcement. The Victim has seen HASHIMI with a gun.

o. While I was interviewing the Victim, Detective Morse located a photograph of HASHIMI. The Victim positively identified the person in the photograph as HASHIMI.

p. Detective Morse located a photograph of Vincent Bichard. The Victim positively identified the person in the photograph as Vanessa Jackson, the transgender female.

11

q. On the day the police located the Victim, HASHIMI had dropped the Victim off at the Meadowview Light Rail Station in Sacramento, California. The Victim indicated that she was walking to a hotel to meet a friend to pick up clothes when her family members and the police found her.

21.     During the interview, the Victim provided verbal consent to search her cell phone, which was seized from her on November 11, 2014, and booked into SPD property.

22.     The Victim accessed her Tagged.com account and navigated to an instant message communication between the Victim and a Tagged user with the profile name "Benny L." Benny L's profile indicated that he was 23 years old and lived in Elk Grove, California. There was a photograph of HASHIMI's face that was linked to the Benny L profile. The Victim identified the Benny L profile as HASHIMI's Tagged profile.

23.     The following is an excerpt of the conversation between the Benny L Tagged account and the Victim. The exact dates of the following messages are not known.[1]

> S: It stooped.  I woke upp and went rite bak lol
>
> S: Happy easter
>
> V: Happy Easter.  To u to wyd [what you doing][2]
>
> S: Work im off in a couple hours wydk
>
> V: Wyd
>
> V: Gn [good night]
>
> V: Wyd
>
> S: Nothin I just woke wyd
>
> S: How come u don't talk to me
>
> S: Its like webgoing back to were we left off.
>
> S: Im noy mad but I kno u not fukin wit me and u tryna have me b yur side

---

[1] Tagged user Benny L's statements are identified by "S"; "V" identifies the Victim's statements.

[2] Bracketed items contain definitions of common online chat and prostitution-related terms.

nigga or sum

S: Cuz I kno forsure u talkin to da other nigga

S: It make me sad dat everytime I sign in u don't b saying notin to me. Its like u don't wanna have a convosation

S: It make me sad to were I don't even wanna sigh on cuz I don't wanna b disappointed

V: I don't have a phone all da time and ur not ma side nigga

V: But hows your day going

S: I been ttyna giv u a fone but u wont take it

V: Wyd

V: How ur day

S: It ok. My check was suppose to come at 630 but it hasn't come yet. So I gota wait till tomarrow to c wassup but other den dat kool

S: Wbu [what about you]

V: Nothing really making down

V: Gn

V: Wyd to day [what are you doing today]

S: Tryna find sumwer to sleep

S: Ima come to truxel and wen I c u I swear to god ima beat da life out of u I promise to god as my witness

S: And if I don't find u der ima go to yur mama house and beat one of your little  brothers lifes out of dem on g o d.

V: And da cops would be called ur mad why

V: I really don't care what u do to him cot not me and that's getting ur self cought up but any I didn't do shit to u and u clam u love me and look how u act

S: Yep we will c

S: Fuk ur love

13

S: Ima beat yur ass on my life

V: And that's why u say ur not a pimp ill call da cops and youll go to jail if that's da case ur mad why?

V: Just like u no were I live I no were u be at u really do to much cause ur mad for no reason

S: Ok idont care fr [for real] call dem. But I promise wen I c u ima beat da fuk out of u. Call da police I swear to god idc [I don't care]. Frfr [for real for real]

V: Okayy and why r u mad?

S: Yep

V: Ur hella stupid cause if I tell on u u finna get hella time how come u just cant leave ma tf [the fuck] alone and nove on with ur life cause at da end of da day u did this to yourself

S: Yep wen tgey find but I bet ima find u first

S: Bet u b in acoma

S: Or brain dead

V: Ig [I guess] but why that's all I wont to no

S: Yup

V: U keep on saying yep why what did I do to u

V: Ur a waek men u fight little ass kids and a female put yo hands on a real as nigga for once in yo life weak as bitch u make no fucking since ur mad cause your broke ass cant make ur own fucking money get a real job ur 22 and still in school tf [the fuck]

S: Yep we gone c

S: U talkin now

S: But u gone b screamin

S: U know wat u right. Im sorry

V: U no damn fucking well u don't mean it I never wonted to do any harm

14

to u in ma life I wanted to be married to u but u scard me for life I didn't

do this u did so stop blaming it on me and be real

V: Im not fallin for it

V: …

V: Okay ignore me now its cool

S: 9164658822

S: U hella disrespect

### Text Messages Between the Victim and Hashimi

24.     I obtained the Victim's cell phone from SPD evidence storage.  The Victim

previously gave consent for law enforcement to search the phone.  I was able to bypass the

phone's security code.  The phone contained several text messages between the Victim and a

person using the phone number (916) 670-9792, which the Victim identified as HASHIMI's

phone number.  See ¶ 19(e).  The messages between the Victim and HASHIMI began on October

19, 2014, and continued until November 11, 2014, which was the day SPD officers found the

Victim.

25.     Metro PCS records indicate that as of November 11, 2014, the account holder for

telephone number (916) 670-9792 was Abdul Hashimi.  The address listed in the Metro PCS

account records was 8484 McGray Way Sacramento, California 95824.  Sacramento County

Sherriff's Department booking records indicate that on February 26, 2014, HASHIMI provided

his address as 8484 McGray Way Elk, Grove, Ca 95624.

26.     The following is an excerpt of text messages between the Victim and HASHIMI's

telephone number, which were found on the Victim's phone.  The following texts are dated

November 11, 2014.

S: I don't c u outhere

V: Im walking

S: Where

V: Dollar tree

S: oh okay I still don't c u tho

V: Okay

S: wer r u

V: I got a 50 date [act of prostitution for $50]

S: Ok

V: I'm going to his house

S: for how much

V: 50

S: ok ima drive off and dat bill

V: K

S: Imean pay it

V: Just got here

S: ok im parked in front of the laundrymat

V: Coming

S: hey

V: ya

S: wtf [where the fuck] u at

V: Im coming right now

S: u better have more den 50

V: He said he doesn't have any more

S: bitch wen u come back im leaving u just gave a niga a whole hour for

50 dollars wtf

S: just keep bustin some dates [acts of prostitution]

V: U said u were leaving me

27.     Based on my training and experience, the foregoing text messages are consistent with a conversation between a pimp and a prostitute regarding prostitution.

### *The Backpage.com Advertisement for the Victim*

28.     Backpage.com provided records regarding escort advertisement post ID 7670931 Sacramento. As set forth in paragraph 16, this post includes the Victim's telephone number, and

according to the Victim, the post was intended to advertise the Victim's prostitution services. Backpage.com records indicate that the email account associated with the Backpage.com account that posted the advertisement was abdulbasierhashimi@yahoo.com (the "TARGET ACCOUNT").

### Hashimi's Tagged.com Account

29.     By reviewing the Tagged.com messages that the Victim provided, I identified the Tagged.com account number for the Tagged.com user "Benny L." The account number was 5983607179.

30.     On August 28, 2015, United States Magistrate Judge Kendall Newman signed a search warrant for all information related to the Tagged.com account number 5983607179.

31.     Tagged.com produced information regarding account 5983607179, which identified the owner of the account as Benny Laden, date of birth June 15, 1992. Tagged.com records indicate that the email address linked to the account is the TARGET ACCOUNT.

32.     HASHIMI has a tattoo of the text "Bin Laden" on his left forearm. HASHIMI's date of birth is June 15, 1992. According to Tagged.com records, the first contact between the Benny L Tagged account and the Victim was August 8, 2014.

### Interview of Abdul Basier Hashimi

33.     On March 15, 2016, I contacted HASHIMI after arresting him for a probation warrant at the Sacramento Sheriff's Department at 711 G Street. I advised HASHIMI of his Miranda rights. He indicated that he understood his rights. The following is a summary of HASHIMI's statements:

   a.  HASHIMI denied knowing the Victim.

   b.  HASHIMI stated that he has a Tagged.com account. When asked whether his Tagged.com user name was "Benny L," HASHIMI stated "I guess, I don't know. I don't really see it like that."

   c.  HASHIMI indicated that his email account was his name with the internet domain "@yahoo." When asked if the email address was "Abdul Hashimi," he stated it was "Abdul Basier Hashimi." When asked if he

17

still used the email account, HASHIMI stated, "Nah, I put it on things. I don't even know the password."

d.   HASHIMI indicated that he believes that Backpage.com is for "whores." He denied using the site. After being shown that the TARGET ACCOUNT was linked to a Backpage.com advertisement, HASHIMI stated "I don't know. I haven't been on my page I mean I haven't been on my email."

### *The Victim's Fourth Interview*

34.   On April 6, 2016, I re-interview the Victim. The following is a summary of the Victim's statements during the interview:

a.   The Victim did not want HASHIMI to be arrested because he knew where she lived. She believed that if HASHIMI knew that she spoke to law enforcement, it would not be good.

b.   The Victim talked to HASHIMI a few weeks prior about the situation. The Victim indicated that she told HASHIMI that she spoke to the police.

c.   The Victim indicated that if HASHIMI knew she cooperated with law enforcement, she would not be inclined to cooperate further, suggesting that she could not take the risk because she now has a child. She indicated that HASHIMI had never done anything to her, but she thought he would. The Victim asked whether the case could be dropped.

d.   The Victim indicated that HASHIMI did not know her age because she lied to him. She stated that since HASHIMI told her that the police talked to him, she has had dreams about him killing her.

e.   The Victim indicated that HASHIMI does not bother her anymore and she thinks he will leave her alone if it all ended. She stated that he did not force her to do anything.

f.   The Victim stated that in an earlier statement to law enforcement, she stated that HASHIMI had other girls working for him as prostitutes, but he

18

did not.  The Victim indicated that she posted all her own prostitution advertisements and that HASHIMI never posted advertisements for her.

g.   The Victim stated that HASHIMI hit her twice.  She explained that the first time he hit her because she threw something at him and the second time he hit her because she lied to him.  The Victim stated that it was not because of "all of this."

35.   In general, an email that is sent to a Yahoo Inc. subscriber is stored in the subscriber's "mail box" on Yahoo Inc. servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on Yahoo Inc. servers indefinitely.  Even if the subscriber deletes the email, it may continue to be available on Yahoo Inc. servers for a certain period of time.

## V.   BACKGROUND CONCERNING EMAIL

36.   In my training and experience, I have learned that Yahoo Inc. provides a variety of on-line services, including electronic mail ("email") access, to the public.  Yahoo Inc. allows subscribers to obtain email accounts at the domain name yahoo.com, like the email account listed in Attachment A.  Subscribers obtain an account by registering with Yahoo Inc.  During the registration process, Yahoo Inc. asks subscribers to provide basic personal information.  Therefore, the computers of Yahoo Inc. are likely to contain stored electronic communications (including retrieved and unretrieved email for Yahoo Inc. subscribers) and information concerning subscribers and their use of Yahoo Inc. services, such as account access information, email transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

37.   A Yahoo Inc. subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Yahoo Inc.  In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

38.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

39.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

40.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

20

41.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## VI.    CONCLUSION

42.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Yahoo Inc. who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant

21

at any time in the day or night.

## VII.    REQUEST FOR SEALING

43.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Derek Stigerts
Special Deputy United States Marshal
FBI Child Exploitation Task Force

Subscribed and sworn to before me on:  Dec 9, 2016

The Honorable Kendall J. Newman
United States Magistrate Judge

Approved as to form by AUSA BRIAN A. FOGERTY

22

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with abdulbasierhashimi@yahoo.com that is stored at premises controlled by Yahoo Inc., a company that accepts legal process at 701 First Avenue, Sunnyvale, California 94089.

## **ATTACHMENT B**

### **Particular Things to be Seized**

**I.      Information to be disclosed by** Yahoo Inc. **(the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

B-2

e.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes evidence, instrumentalities, fruits of violations of 18 U.S.C. § 1591(a), those violations involving ABDUL BASIER HASHIMI and occurring after August 8, 2014, including, for each account or identifier listed on Attachment A, information pertaining to the following matters;

(a) Any images which appear to be prostitution-related;

(b) Any items, information or records which reference Backpage.com or any other internet prostitution sites;

(c) Any items, information or records which reference the social media application Kik.com;

(d) Any items, information or records which reference the social media application Tagged.com;

(e) Any items, information, records or prostitution-related images related to or used to further prostitution;

(f) Any items, information, or records which contain information pertaining to any individual's interest in the sex trafficking of a minor;

(g) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(h) Evidence indicating the email account owner's state of mind as it relates to the

crime under investigation;

(i) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

### CERTIFICATE OF AUTHENTICITY OF DOMESTIC
### BUSINESS RECORDS PURSUANT TO FEDERAL RULE
### OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this declaration is true and correct. I am employed by Yahoo Inc., and my official

title is _____. I am a custodian of records for Yahoo Inc.. I state

that each of the records attached hereto is the original record or a true duplicate of the original

record in the custody of Yahoo Inc., and that I am the custodian of the attached records

consisting of _____ (pages/CDs/kilobytes). I further state that:

    a.     all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth, by, or from information transmitted by, a person with

knowledge of those matters;

    b.     such records were kept in the ordinary course of a regularly conducted business

activity of Yahoo Inc.; and

    c.     such records were made by Yahoo Inc. as a regular practice.

    I further state that this certification is intended to satisfy Rule 902(11) of the Federal

Rules of Evidence.

_____    _____

Date                Signature

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of California

|  |  |
|---|---|
| In the Matter of the Search of ) | |
| ) | |
| INFORMATION ASSOCIATED WITH ) | Case No. **2 16 - SW - 0 7 7 1    KJN** |
| abdulbasierhashimi@yahoo.com THAT IS STORED AT ) | |
| PREMISES CONTROLLED BY Yahoo Inc. ) | **SEALED** |
| ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the ____ Eastern ____ District of ____ California ____ *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before     Dec  23, 2016 *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☐  Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐   for _____ days *(not to exceed 30)*  ☐  until, the facts justifying, the later specific date of _____

Date and time issued:    Dec  9, 2016  1:30 p.m.

_____
*Judge's signature*

City and state:      Sacramento, California

Kendall J. Newman, U.S. Magistrate Judge
*Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____     _____
Signature of Judge                                          Date

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with abdulbasierhashimi@yahoo.com that is stored at premises controlled by Yahoo Inc., a company that accepts legal process at 701 First Avenue, Sunnyvale, California 94089.

A-1

## ATTACHMENT B

### Particular Things to be Seized

I.      **Information to be disclosed by** Yahoo Inc. **(the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

B-2

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes evidence, instrumentalities, fruits of violations of 18 U.S.C. § 1591(a), those violations involving ABDUL BASIER HASHIMI and occurring after August 8, 2014, including, for each account or identifier listed on Attachment A, information pertaining to the following matters;

(a) Any images which appear to be prostitution-related;

(b) Any items, information or records which reference Backpage.com or any other internet prostitution sites;

(c) Any items, information or records which reference the social media application Kik.com;

(d) Any items, information or records which reference the social media application Tagged.com;

(e) Any items, information, records or prostitution-related images related to or used to further prostitution;

(f) Any items, information, or records which contain information pertaining to any individual's interest in the sex trafficking of a minor;

(g) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(h) Evidence indicating the email account owner's state of mind as it relates to the

B-3

crime under investigation;

(i) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).